**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 13-cv-1716-WJM-NYW

ANGELIA MCGOWAN,

     Plaintiff,

v.

BOARD OF TRUSTEES FOR METROPOLITAN STATE UNIVERSITY OF DENVER,

     Defendant.

---

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Angelia McGowan ("Plaintiff" or "McGowan") brings this action arising out of her employment with the Metropolitan State University of Denver ("Metro State"), asserting claims of a hostile work environment, racial discrimination, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.* ("Title VII"), and retaliation under the Family Medical Leave Act, 29 U.S.C. § 2615(a) ("FMLA"). (Am. Compl. (ECF No. 29).) Before the Court is Defendant Board of Trustees for Metropolitan State University of Denver's ("Defendant") Motion for Summary Judgment ("Motion"). (ECF No. 50.) For the reasons set forth below, the Motion is granted.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute

as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Stone v. Autoliv ASP, Inc*., 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995); *Houston v. Nat'l General Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTUAL BACKGROUND

The relevant facts, viewed in the light most favorable to the Plaintiff, are as follows, and are undisputed unless otherwise noted.  Plaintiff, an African-American female, was hired in September 2007 by Metro State as the Assistant Director of Communications.  (Movant's Statement of Material Facts ("MSMF") (ECF No. 50 at 1–11) ¶¶ 1, 3.)  Plaintiff was hired under Metro State's "Target of Opportunity" Program, a type of affirmative action program that allows a candidate from an underrepresented minority group to receive expedited consideration with less review of other competing candidates.  (*Id.* ¶ 4; ECF No. 54 at 3.)  Plaintiff testified that during her initial conversation with Catherine Lucas, then the Associate Vice-President for

Communications and Advancement at Metro State, Lucas emphasized the priority

Metro State placed on increasing Latino student enrollment, leaving Plaintiff with the

impression that Lucas wanted to hire a Latino employee rather than an African-

American.[1]  (Statement of Additional Material Facts ("SAMF") (ECF No. 54 at 7–15) ¶¶

32–33, 56; MSMF ¶ 3.)

In Plaintiff's initial position, she was responsible for overseeing and managing

Metro State's external communications program targeted to faculty, staff, students, and

the community.  (MSMF ¶ 5.)  Plaintiff was initially supervised by Lucas.  (*Id.* ¶ 6.)  Part

of Plaintiff's work under Lucas included preparing news releases about activities or

programs at Metro State to be sent to targeted members of the media (a "primary

placement"), and responding to media requests for potential stories by providing

relevant information or identifying faculty experts to respond (a "secondary placement").

(*Id.* ¶ 19 n.1.)

In or about January 2009, Lucas began to have concerns with Plaintiff's

performance.  (*Id.* ¶ 7.)  In mid-2009, Plaintiff was transitioned out of media relations

and into internal communications, where she was supervised by Donna Fowler, the

Director of Internal Communications.  (*Id.* ¶ 9; ECF No. 50-13 at 4.)  Plaintiff maintained

---

[1] Defendant disputes these statements and others derived from Plaintiff's deposition, arguing that "[t]here is no evidence to support" them and that Plaintiff's "impression" is not evidence.  (ECF No. 67 at 8.)  However, Defendant provides no citation to contrary evidence to support its denial, in violation of this Court's practice standards.  *See* WJM Revised Practice Standard III.E.5 ("Any denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and *a specific reference to admissible evidence in the record supporting the denial*." (emphasis added)).  As Defendant is undoubtedly aware, a party's deposition testimony constitutes evidence which must be taken in the light most favorable to that party where she is the non-movant.  *See Quaker State Minit-Lube*, 52 F.3d at 1527.  In the absence of contrary evidence, the Court deems these statements from Plaintiff's deposition admitted for the purposes of the instant Motion.

the same title and the same salary in this new position, but no longer handled media placements; instead, approximately 50% of her new responsibilities entailed preparing and editing Metro State's online publications for faculty and staff, known as @Metro. (MSMF ¶¶ 9–10; ECF No. 54 at 4.) A white male, Tim Carroll, was later hired to take over Plaintiff's former position reporting to Lucas. (SAMF ¶ 10.)

On November 27, 2009, the President of Metro State received an anonymous letter alleging racial discrimination and harassment against an employee of Metro State who was an African-American female. (MSMF ¶ 12.) Plaintiff testified that she believed Lucas and Fowler thought she was either the author of the letter or was associated with the author, which led to a change in their attitude toward her, while Lucas and Fowler each testified that they did not believe she (Plaintiff) was associated with the letter. (*Id.* ¶¶ 13–15.)

On April 30, 2010, Plaintiff received a performance evaluation for the prior year, which covered several months of her work under Lucas and several months of work under Fowler. (MSMF ¶ 18; ECF No. 54 at 5.) Plaintiff's "Overall Performance Rating" was rated at "Achieves Performance Standards," or a score of 1 on a scale from 0 to 3, with 3 being the highest score attainable. (MSMF ¶ 17.) In the narrative portion of her performance evaluation, Fowler indicated that Plaintiff was transferred to internal communications because "she was having difficulty in meeting the expectation[s] of her position," particularly because "it seemed as though she was uncomfortable in her role of securing proactive primary media placements." (ECF No. 50-13 at 4.) Fowler further noted that:

> As part of this evaluation, Angie turned in a report of her primary and secondary media placements for the first quarter of the evaluation period prior to her change in job responsibilities. Some of the placements were listed as primary when they were secondary or they were reactive not proactive. In addition, Angie included placements that were not a result of her actions. This constitutes a serious trust issue for both myself and Cathy [Lucas]—an issue that must be resolved by Angie working to regain that trust in the coming months.

(*Id.*) With regard to the media placements issue, Plaintiff testified that during the April 30, 2010 meeting about her performance evaluation, Lucas accused Plaintiff of "fudging" or "fibbing" on her media placement report, but that Plaintiff advised Lucas the report was only a draft. (MSMF ¶ 21; SAMF ¶¶ 37–38.) Plaintiff now agrees that there were inaccuracies in the report. (MSMF ¶ 23.) In the handwritten notes on Plaintiff's performance evaluation under the "Media Placement" rating of .75 on a scale of 0 to 3, either Fowler or Lucas wrote, "Angie was unclear what constitutes primary proactive * * * her former supervisor had [illegible] . . . 5 years should have known." (ECF No. 50-13 at 7.) Following the meeting, Fowler wrote an e-mail to Plaintiff emphasizing her concerns about the media placement report. (MSMF ¶ 22.)

On May 9, 2010, Plaintiff submitted a written rebuttal to her April 30, 2010 performance evaluation to be included in her personnel file. (*Id.* ¶ 24; ECF No. 51.) Plaintiff's rebuttal stated, "I believe a hostile work environment has been created because 1) Lucas chose to forego established protocol in evaluating me for the first quarter . . . ; 2) Lucas and Fowler showed lack of leadership through my transition of duties during the fall 2009 semester." (ECF No. 51 at 1.) Plaintiff's rebuttal discussed details regarding the media placement issue and the difficulties she faced during the

transition between job duties, ultimately noting that Lucas's and Fowler's expressed concern with "trust" meant that "[w]hen I left my evaluation I believed that if I inadvertently spelled a word wrong that it could blow up into a major issue.  Or if I say that I talked to a certain person, I've got to go above and beyond to prove that I truly had a conversation with someone.  In that respect I believe a hostile work environment has been created."  (*Id.* at 4.)

In June 2010, Plaintiff met with Dr. Percy Morehouse, the Executive Director of Metro State's EEO Office, and complained about being mistreated by Lucas and Fowler.  (MSMF ¶ 25.)  At Plaintiff's request, Morehouse did not inform Lucas or Fowler of his discussions with Plaintiff, and no written grievance was filed.  (*Id.* ¶ 26.)

On June 15, 2010, Plaintiff sent a letter appealing her April 30, 2010 performance evaluation.  (*Id.* ¶ 28.)  On July 15, 2010, Plaintiff met with Lucas, Fowler, and the Executive Director of Human Resources to discuss Plaintiff's performance evaluation, resulting in Plaintiff receiving credit for five of sixteen primary placements in her media placement report, and an addendum to Plaintiff's performance evaluation.  (*Id.* ¶¶ 29–31.)  Plaintiff's overall rating of "Achieves Performance Standards," or a score of 1 on a scale from 0 to 3, did not change.  (SAMF ¶ 22.)

On August 18, 2010, Fowler sent an e-mail to Plaintiff relating her concerns about the quality of @Metro and Plaintiff's ability to manage the publication successfully.  (*Id.* ¶¶ 32–33.)  On October 11, 2010, Fowler sent an e-mail to Plaintiff noting "a few significant missteps" in Plaintiff's performance of her job duties, and stating that she was "less confident" about Plaintiff's feelings about her new position.

(*Id.* ¶ 34; ECF No. 51-6.)  On January 5, 2011, Fowler sent Plaintiff another e-mail identifying areas where she believed Plaintiff was falling short of successfully performing her job duties, noting that she would allocate funds to send Plaintiff to a training, but also noting that the e-mail was "your second warning."  (MSMF ¶ 35.) Plaintiff testified that when she received this e-mail, she thought it sounded like she was about to be fired.  (SAMF ¶ 43.)

In April 2011, Fowler issued a performance evaluation for Plaintiff which rated her at 1.36.  (*Id.* ¶ 54.)  Fowler explained that she could not identify any particular improvement in the issues leading to the second warning by the date of the April 2011 performance evaluation, noting that the increase in rating from the April 2010 evaluation was due to Plaintiff's low score on media placements in 2009–2010, which was no longer part of her job duties for 2010–2011.  (Fowler Dep. (ECF No. 54-2) pp. 76–77.)

In late June 2011, Plaintiff met with Lloyd Moore, Metro State's Benefits Manager, and discussed the availability of medical leave under the FMLA.  (MSMF ¶ 39.)  Moore advised Plaintiff that she should file a formal FMLA request, and e-mailed Plaintiff the necessary forms on June 28, 2011.  (*Id.* ¶¶ 39–40.)  Plaintiff returned the completed forms on June 30, 2011, and was advised on July 5, 2011 that her intermittent (3–5 days per month) FMLA leave had been approved for the time period of July 1, 2011 to June 30, 2012.  (*Id.* ¶¶ 41–42.)  On July 18, 2011, Plaintiff received an e-mail from an employee in Moore's office advising her that she could apply for FMLA leave and providing her with the forms to do so.  (*Id.* ¶ 43; SAMF ¶ 45.)  Plaintiff understood that her leave had been rejected and she had to start the process again. (SAMF ¶ 45.)  In response to Plaintiff's inquiry, Moore sent an e-mail explaining that the

original approval "was an expedited version, due to having a doctor's appointment soon after our meeting (the very next morning, I believe).  I did not want to delay the process for you or require you to schedule an additional appointment with your physician for the purposes of having the medical certification form completed."  (ECF No. 51-14.)  Moore explained certain documentation that would be required to comply with FMLA.  (*Id.*)  However, due to confusion over Moore's e-mail, Plaintiff still believed that she needed to start the process over to apply for FMLA leave.  (Pl.'s Dep. (ECF Nos. 54-1, 67-4) p. 163.)

Moore notified Fowler by e-mail on July 5, 2011, that Plaintiff had applied for FMLA leave.  (MSMF ¶ 46.)  Fowler had not previously been aware that Plaintiff was applying for leave, and spoke with Moore with concerns about what her responsibilities would be.  (*Id.* ¶ 47.)  On July 13, 2011, Plaintiff wrote to Morehouse to request a meeting, at which she discussed the paperwork request and Fowler's reaction to her FMLA leave.  (SAMF ¶¶ 48–49.)  Plaintiff was approved for and took FMLA leave for multiple doctor appointments between July 5, 2011, and the last day of her employment.  (MSMF ¶ 48.)

On August 31, 2011, Plaintiff resigned her position at Metro State.  (*Id.* ¶ 49.)  After providing notice of her resignation, Plaintiff worked for three more weeks, and her last day of employment was on September 23, 2011.  (*Id.*)  Plaintiff testified that she felt she had no choice but to resign due to the criticism of her work, the interference with her FMLA request, her complaints to Morehouse, and Metro State's failure to resolve her mistreatment.  (SAMF ¶¶ 52–53.)

On April 26, 2012, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation based on race, sex, age, and disability, as well as FMLA denial and retaliation. (MSMF ¶ 50; Am. Compl. ¶ 26.) On March 28, 2013, the EEOC issued Plaintiff a Right to Sue letter. (Am. Compl. ¶ 27.)

On June 28, 2013, Plaintiff filed this action against Lucas, Fowler, and Defendant, the governing body of Metro State. (ECF No. 1; MSMF ¶ 2.) Plaintiff subsequently amended her Complaint to dismiss her claims against Lucas and Fowler, asserting six claims against Defendant alone. (Am. Compl. ¶¶ 28–70.) Plaintiff stipulated to dismiss two of those claims on July 9, 2014 (ECF No. 45), leaving four claims against Defendant: (1) racial discrimination in violation of Title VII; (2) a hostile work environment based on race in violation of Title VII; (3) retaliation in violation of Title VII; and (4) retaliation in violation of the FMLA. (ECF No. 29.)

Defendant's Motion seeking summary judgment as to all remaining claims was filed on February 10, 2015. (ECF No. 50.) Plaintiff filed a Response (ECF No. 54), and Defendant a Reply (ECF No. 67). The Motion is now ripe for disposition.

## III.  ANALYSIS

"Under Title VII, it is 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Under the FMLA, it is unlawful "for any employer to interfere with, restrain, or deny" an employee's right to

request or take FMLA leave, as well as "for any employer to discharge or in any other manner discriminate against any individual" in retaliation for the exercise of FMLA rights.  29 U.S.C. § 2615(a)(1)–(2).

The familiar *McDonnell-Douglas* burden-shifting test applies to each of Plaintiff's claims.  *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) (Title VII); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006) (FMLA retaliation).[2]  Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of employment discrimination, hostile work environment or retaliation.  *Id*.  Once Plaintiff makes out a *prima facie* case, the burden shifts to Defendant to come forward with a legitimate, non-discriminatory basis for its adverse employment action.  *Id*.  If Defendant does so, the inference of discrimination drops out and the burden shifts back to Plaintiff to offer evidence showing that her protected status or activity was a determinative factor in the employment action, or that Defendant's non-discriminatory reason was merely pretext.  *Id*.

Defendant moves for summary judgment on all four claims.  The Court will address the merits of each argument in turn below.[3]

---

[2] While a FMLA interference claim is governed by a slightly different analysis, *see Metzler*, 464 F.3d at 1180, Plaintiff states in her Response that her claim is brought under a retaliation theory, not an interference theory, because she "was not ultimately denied FMLA leave and therefore does not satisfy the second element of an interference claim."  (ECF No. 54 at 25–26.)  The Court accepts Plaintiff's characterization of her claim and accordingly proceeds with the retaliation analysis.

[3] In addition to its arguments on the merits of each of Plaintiff's claims, Defendant also argues in its Motion that Plaintiff's claims are time-barred for failure to exhaust administrative remedies to the extent they are based on any adverse employment action occurring prior to July 1, 2011.  (ECF No. 50 at 13–14.)  Defendant correctly notes that Title VII requires a plaintiff to file an EEOC charge within 300 days of the last unlawful act, or earlier in some circumstances.  (*Id*. at 12–13 (citing 42 U.S.C. § 2000e-5(e)(1)).)  However, it is undisputed that

A.    **Hostile Work Environment**

Plaintiff alleges that she was subjected to a hostile work environment based on her race.  (Am. Compl. ¶ 53.)  To meet her *prima facie* burden with respect to the hostile work environment claim, Plaintiff is required to show that: (1) her "workplace was 'permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment,'" and (2) "that she was 'targeted for harassment' because of her" race. *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012) (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)) (brackets omitted).  In determining whether an actionable hostile work environment existed, the Court must consider "all the circumstances" viewed "from the perspective of a reasonable person in the plaintiff's position."  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007).

Defendant argues that Plaintiff has failed to point to sufficient facts showing that the harassment she allegedly suffered was due to her race.  (ECF No. 50 at 14–16.) Defendant notes that Plaintiff's sense that Lucas wanted to hire a Latino employee instead of an African-American was merely her impression, that this single incident

---

Plaintiff's alleged constructive discharge occurred less than 300 days before her EEOC charge was filed, and Plaintiff contends that her claims are based in large part on her constructive discharge.  (ECF No. 54 at 16–17.)  As a result, Defendant's administrative exhaustion argument alone, even if fully credited, is not dispositive of Plaintiff's claims in their entirety.  The Court further notes the Tenth Circuit's recent holding that a plaintiff's failure to exhaust administrative remedies under Title VII does not deprive the Court of jurisdiction.  *Gad v. Kan. State Univ.*, _ F.3d _, 2015 WL 3389211, at *6–7 (10th Cir. May 27, 2015).  Because the Court finds that Plaintiff has failed to defeat summary judgment on the merits of her claims, *see infra*, the Court need not also consider Defendant's administrative exhaustion argument, which would at most provide an alternative basis for summary judgment as to portions of the claims.

occurred in 2007, and that it is insufficient to demonstrate racial animus. (ECF No. 67 at 14–16.) In response, Plaintiff contends that the initial conversation with Lucas shows that Plaintiff "was not welcome [at Metro State] because of her race." (ECF No. 54 at 20.) Plaintiff further cites incidents which she alleges show the severity or pervasiveness of the alleged hostility in her work environment, including referring to her transfer of duties as a "demotion," noting that a white male was hired as her replacement to work under Lucas, and that she was told that a "scorecard" was being kept on her performance after being accused of falsifying her media report. (*Id.* at 20–21.) However, none of these incidents is tied to Plaintiff's race in any way.[4]

The Court agrees with Defendant that the single conversation Plaintiff had with Lucas is insufficient to show a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (isolated, non-egregious incident insufficient to establish pervasively hostile work environment). The Court notes that a single incident that is "extremely serious" can be sufficient to show a severely racially discriminatory work environment. *Id.* at 788. However, the Court has little difficulty concluding that the cited incident here is not sufficiently serious so as to satisfy Plaintiff's *prima facie* burden with respect to her hostile work environment claim. Indeed, Plaintiff testified that she did not recall Lucas actually saying that she did not want to hire an African-

---

[4] In Plaintiff's deposition, she asserts that the term "scorecard" is offensive because it refers to a method of tracking a person and was used for tracking progress of minorities at Metro State. (Pl.'s Dep. p. 32.) Under the circumstances of this case, the Court finds this assertion insufficient to suggest that this term was derogatory or reveals that Plaintiff was targeted because of her race. The Plaintiff has failed to introduce any evidence that the word "scorecard" has any racial denotation or connotation of any kind (adverse or otherwise), either in these circumstances or any context approximating the reality of her work environment.

American, rather stating that "in hindsight, that is what I feel." (Pl.'s Dep. pp. 25–27.) Plaintiff's feeling about what was said in her initial interview with Lucas is plainly insufficient to establish a hostile work environment on its own. *See Faragher*, 524 U.S. at 788.

Moreover, Plaintiff has failed to cite any other evidence that her race was explicitly or implicitly connected to the alleged workplace harassment she faced. Instead, while Plaintiff has emphasized at length the negative attributes of her work environment, she has done so without demonstrating any causal connection to racial animus. (*See* ECF No. 54 at 19–22.) On these facts, the Court finds that no reasonable juror could conclude that Plaintiff suffered an objectively hostile work environment on the basis of her race. *See Bertsch*, 684 F.3d at 1027; *see also, e.g.*, *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir. 1996) (one isolated comment and the use of the term "girlie", "although regrettable, do not demonstrate that the work environment . . . was 'permeated with discriminatory intimidation, ridicule, and insult'").

Accordingly, the Court finds that Plaintiff has failed to meet her *prima facie* burden, and summary judgment in favor of Defendant is appropriate on the hostile work environment claim.

## B.   Race Discrimination

Plaintiff also brings a claim for race discrimination, alleging that she was treated less favorably than non-minority employees. To establish a *prima facie* case for racial discrimination, Plaintiff must show: (1) she is a member of a protected class; (2) she

suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007).

The first prong of the *prima facie* standard is not in dispute in this case; as an African-American employee, Plaintiff is a member of a protected class. However, Defendant disputes the other two prongs, arguing that Plaintiff voluntarily quit rather than being constructively discharged, and that there is no evidence supporting an inference of racial discrimination. (ECF No. 50 at 17–19.)

Plaintiff's Amended Complaint asserts that the adverse employment actions she suffered were "poor performance reviews, unreasonable work assignments, and her constructive discharge." (Am. Compl. ¶ 32.) In the parties' briefing on the Motion, they argue the question of whether the conditions under which Plaintiff resigned were sufficiently intolerable to constitute a constructive discharge. (*See* ECF No. 50 at 17; ECF No. 54 at 22.) However, the Court need not resolve that question here, because Plaintiff has utterly failed to present any evidence satisfying the third prong of the *prima facie* standard, namely that any of the alleged adverse employment actions took place under circumstances giving rise to an inference of racial discrimination. *See PVNF*, 487 F.3d at 800.

As discussed above, the only evidence Plaintiff offers connecting her negative workplace experience with her race was the conversation with Lucas at the time she was hired regarding the Target of Opportunity program, and the fact that when Plaintiff's job duties were changed, her previous position under Lucas was given to

14

Carroll, a white male.  (*See* SAMF ¶¶ 10, 32–33.)  However, the evidence shows that the conversation with Lucas took place in 2007 when Plaintiff was first hired, with no cognizable connection to the disputed performance reviews, "unreasonable work assignments," or alleged constructive discharge.  As to Plaintiff's transfer of job duties—which she terms a "demotion"—and her replacement by a white male, the Court notes that the Amended Complaint contains no allegation that such alleged demotion constitutes an adverse employment action for the purposes of her discrimination claim.[5] (Am. Compl. ¶ 32.)  Even if the Court were to construe the alleged demotion as such, Plaintiff has failed to make any argument showing that Carroll was similarly situated to Plaintiff or that he was treated differently with respect to performance evaluations, work assignments, or otherwise so as to suggest racial discrimination.  *Cf. English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1011 (10th Cir. 2001) (plaintiff satisfies *prima facie* burden by showing that similarly situated non-racial minority employees were treated in a more favorable manner, as this gives rise to an inference of discrimination).  The Court concludes that Plaintiff's cited evidence does not establish circumstances suggesting racial discrimination.

Plaintiff's failure to show that any of the alleged adverse employment actions took place under circumstances giving rise to an inference of discrimination is fatal to her Title VII race discrimination claim.  *PVNF*, 487 F.3d at 800.  Accordingly, summary judgment in Defendant's favor is appropriate on that claim.

---

[5] Instead, Plaintiff appears to construe her alleged demotion as one of the intolerable conditions establishing her constructive discharge.  (*See* ECF No. 54 at 21.)

C.    **Title VII Retaliation**

To establish a *prima facie* case of retaliation, Plaintiff must show: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  Plaintiff alleges that she was subjected to intolerable conditions, forcing her to resign, in retaliation for having complained of a "hostile work environment" in her May 9, 2010 rebuttal to her performance evaluation, and for having made a complaint of harassment to Morehouse on June 15, 2010.  (ECF No. 54 at 30.)

Defendant does not explicitly challenge whether Plaintiff's complaints constitute protected activity under Title VII, instead contending that Plaintiff cannot meet her *prima facie* burden because none of the challenged actions can be reasonably considered materially adverse, and because no causal connection existed between the protected activity and the adverse actions.  (ECF No. 50 at 22–25.)  However, as to the May 9, 2010 rebuttal letter, the evidence does not support a finding that it constitutes protected activity under Title VII.

To constitute protected activity, Plaintiff must have had a reasonable, good-faith belief that the conduct she reported violated Title VII.  *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984).  Even a finding that no Title VII violation existed, however, is not dispositive of whether Plaintiff's report was protected activity for

purposes of her retaliation claim.  *Jeffries v. Kansas*, 147 F.3d 1220, 1231 (10th Cir. 1998) ("a plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII").  Thus, if Plaintiff had a good faith belief that the "hostile work environment" she reported on May 9, 2010 violated the law, her report was protected.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001).

In Plaintiff's May 9, 2010 rebuttal letter, she used the phrase "hostile work environment" twice.  (ECF No. 51 at 1, 4.)  However, as noted above, there is no evidence in the record suggesting that the alleged hostile work environment resulted from Plaintiff's race or any other protected status, nor is there any such allegation in the rebuttal letter.  Instead, Plaintiff's letter cites supervisory failures by Lucas and Fowler in communicating Plaintiff's responsibilities and following administrative protocol, as well as their failures of leadership, jumping to conclusions without listening to Plaintiff's explanations, and accusing her of falsifying her report when it was merely a draft.  (*Id.*) Viewing the evidence in the light most favorable to Plaintiff, these were justifiable reasons to complain of hostility in her work environment.  However, nothing in Plaintiff's rebuttal letter or elsewhere in the record supports a finding that it would be reasonable for a person in Plaintiff's position to assume that such hostility resulted from racial animus or otherwise violated Title VII.  The use of the term "hostile work environment" alone does not invoke Title VII.  Accordingly, the Court concludes that Plaintiff's rebuttal letter of May 9, 2010 does not constitute protected opposition to discrimination under Title VII.

However, Plaintiff's meeting with Morehouse in Metro State's EEO Office could conceivably constitute protected activity.  Even if no discrimination of a racial nature was specifically discussed, a reasonable person in Plaintiff's position could believe that an employee's right to complain about workplace conditions to an EEO Office was protected by Title VII.

Nevertheless, to satisfy her *prima facie* burden, Plaintiff must still present evidence establishing a causal connection between her June 2010 meeting with Morehouse and materially adverse employment actions.  *See Argo*, 452 F.3d at 1202. Defendant argues that her meeting with Fowler and Lucas on July 15, 2010, and Fowler's e-mails of August 18, 2010, October 11, 2010, and January 5, 2011, were the only cited adverse actions that closely followed Plaintiff's meeting with Morehouse, and that Lucas and Fowler testified that they had no knowledge of that meeting.  (ECF No. 50 at 24–25.)

The Court agrees with Defendant that, if it is undisputed that Fowler and Lucas were unaware of Plaintiff's complaint to Morehouse, Plaintiff cannot show that their subsequent adverse actions were causally related to that complaint.  *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." (emphasis in original)).  Accordingly, the question is whether this fact is in dispute.

Plaintiff cites her own deposition, in which she was questioned about an allegation in her EEOC charge that "Ms. Lucas and Ms. Fowler ridiculed Plaintiff for

going to [the] equal opportunity office to complain."[6]  (Pl.'s Dep. p. 110.)  In response to

opposing counsel's question advising Plaintiff that Lucas and Fowler each testified that

they did not know about Plaintiff's complaint to Morehouse, Plaintiff stated, "They knew.

How they knew, I do not know, but they knew."  (*Id.*)  However, a few minutes prior in

the same deposition, the following exchange occurred:

> Q.     . . . Do you know whether or not that's true, that he
>           [Morehouse] did not inform your supervisors?
>
> A.     I don't know if he talked to them or not.
>
> Q.     Okay.  So as far as you know, neither Cathy Lucas or Donna
>           Fowler knew about these discussions you had with Percy
>           Morehouse in June of 2010?
>
> A.     I do not know.

(*Id.* p. 103.)  Plaintiff's inconsistent and equivocal statements, paired with evidence of

testimony by Morehouse, Lucas, and Fowler that Lucas and Fowler were not informed

of Plaintiff's meeting with Morehouse, fail to create a genuine dispute as to whether

Plaintiff's supervisors had knowledge of her protected activity.  Thus, Plaintiff has failed

to show a causal connection between her meeting with Morehouse and the challenged

actions, and has failed to satisfy her *prima facie* burden.  *See Petersen*, 301 F.3d at

1188.

Even if a reasonable jury could find that Lucas and Fowler did have such

knowledge and that the temporal proximity to the challenged employment actions

---

[6] Notably, this allegation does not appear in the Amended Complaint, and Plaintiff has cited no evidence supporting it.  Instead, Plaintiff's Amended Complaint asserts only that after her meeting with Morehouse, "Lucas and Fowler intensified their harassment of her, thus making the hostile work environment worse."  (Am. Compl. ¶ 13.)

establishes causation for the purposes of Plaintiff's *prima facie* case, the Court finds that Plaintiff's Title VII retaliation claim nevertheless fails at a later stage of the burden-shifting analysis.  Plaintiff does not dispute that Defendant has satisfied its burden by arguing that Plaintiff's poor performance was a legitimate, non-retaliatory reason for the challenged actions, which shifts the burden back to Plaintiff to demonstrate that this reason is pretextual.  *See McDonnell Douglas*, 411 U.S. at 804.  In defense of her Title VII retaliation claim, Plaintiff's sole argument as to pretext is that "the most pointed criticism of Ms. McGowan, as to the alleged falsification of the media report, pertained to a job duty that had previously been taken away from her, and was not part of her current job description at all."  (ECF No. 54 at 31.)  However, the only one of the alleged adverse actions that dealt with the media report was the July 15, 2010 meeting, which occurred in response to Plaintiff's appeal of her performance evaluation and resulted in Plaintiff receiving retroactive credit for some of the media placements in the report. (MSMF ¶¶ 28–31.)  The other alleged adverse actions—Fowler's e-mails of August 18, 2010, October 11, 2010, and January 5, 2011—explicitly referred to Plaintiff's new job duties on @Metro.  (*Id.* ¶¶ 32–35.)  Plaintiff has presented no evidence or argument supporting a finding that Defendant's concerns about Plaintiff's performance of her new job duties was pretext for retaliation.

Consequently, Plaintiff has failed to show any genuine dispute of material fact which would permit her Title VII retaliation claim to survive summary judgment. Defendant's Motion is therefore granted as to that claim.

D.    **FMLA Retaliation**

Like Title VII retaliation, an employee bringing a FMLA retaliation claim must first establish a *prima facie* case by showing that (1) she engaged in a protected activity, (2) she was adversely affected by an employment decision, and (3) there was a causal connection between the protected activity and the adverse action.  *Metzler*, 464 F.3d at 1171 (citing *Argo*, 452 F.3d at 1202).

Defendant argues that Plaintiff fails to establish a *prima facie* case of FMLA retaliation because she has failed to present evidence of a materially adverse employment action.  (ECF No. 50 at 19–22.)  Plaintiff's Complaint alleges that Metro State violated the FMLA by retaliating against her for applying for FMLA leave, leading to intolerable working conditions and constructive discharge.  (Am. Compl. ¶¶ 68–69.)  Thus, Plaintiff's Response alleges that the following actions were materially adverse, leading to her constructive discharge:

- In a one-on-one meeting with Fowler, Plaintiff was told that she should not look to advance in her position because Fowler and Lucas would likely "maintain their roles for a while."

- Fowler told Plaintiff that she needed to do "all of her job," regardless of any FMLA leave, which Plaintiff understood to mean that she was required to check and respond to e-mail during doctor's appointments.

- Lucas heavily critiqued Plaintiff's media report and criticized her in front of another colleague.

- Fowler and Lucas reprimanded Plaintiff for investigating a story about international travel by Metro State officials.

- Lucas refused to provide Plaintiff with a draft of a speech by the President of Metro State, even though such a draft would normally have been provided.

(ECF No. 54 at 28.)  The Court notes that Plaintiff provides no citations to evidence in the record for any of these incidents, and they do not appear to be included in Plaintiff's Statement of Additional Material Facts.[7]  Nevertheless, Defendant does not contest whether evidence exists in the record to support these events; rather, it argues that none of those events that occurred after Plaintiff applied for FMLA are materially adverse (and that those events that occurred prior to Plaintiff's FMLA request, such as Plaintiff's alleged demotion and the falsification accusation, could not have been retaliation for the FMLA request).  (ECF No. 67 at 20–22.)

Both parties cite *Burlington Northern and Santa Fe Railway Co. v. White* ("*White*"), a 2006 U.S. Supreme Court decision, in support of their arguments.  548 U.S. 53.  In *White*, the Supreme Court provided clarity for the material adversity standard, explaining that the materially adverse requirement allows courts to "separate significant from trivial harms."  *Id.* at 68.  Thus, the Court noted, an action is materially adverse where it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," as opposed to "the ordinary tribulations of the workplace," such as "petty slights or minor annoyances that often take place at work and that all employees experience."  *Id.* (internal quotation marks omitted).  The *White* Court further explained that the particular circumstances under which an action occurred must be taken into consideration, for example, a minor schedule change that greatly affects a

---

[7] This failure violates this Court's practice standards, which advise that the party opposing a motion for summary judgment should include, in any Statement of Additional Disputed Facts, "each additional material disputed fact which undercuts movant's claim that movant is entitled to judgment as a matter of law," and that such facts "shall be accompanied by specific reference to admissible evidence in the record which establishes the fact or demonstrates that it is disputed."  WJM Revised Practice Standard III.E.6.

mother with young children, or a supervisor's exclusion of an employee from a lunch that included training contributing to the employees' professional advancement. *Id.* at 69.  Consequently, the Court concluded that a reassignment of the plaintiff's duties was materially adverse where there was evidence that the new tasks were more arduous, dirtier, and considered less prestigious because the work required fewer qualifications. *Id.* at 71.

Here, both parties contend that *White* supports their respective positions. Defendant cites numerous post-*White* cases finding that verbal and written warnings, negative comments, low scores on performance evaluations, and similar job-related criticism does not constitute materially adverse action where there is no evidence of any affect on the employee's job prospects, likelihood of termination, or employment status. (ECF No. 50 at 21; ECF No. 67 at 20–21.)  Plaintiff similarly cites *White*, analogizing the reassignment of job duties in that case to Plaintiff's reassignment in her duties, "downgrad[ing]" her responsibilities, and accusations of incompetence and dishonesty. (ECF No. 54 at 27.)  However, Plaintiff does not explain how these materially adverse actions could conceivably have been in retaliation for the FMLA request Plaintiff did not make until a year later.  Plaintiff cannot rely on adverse actions that pre-date the FMLA request to support a claim of FMLA retaliation, particularly where there is undisputed evidence that Plaintiff's supervisors did not know of the FMLA request until it had already been approved.  (MSMF ¶¶ 46–47.)

As to the allegation that Plaintiff felt obligated to check e-mail during the time she was on FMLA leave, this could conceivably support a FMLA interference claim that

could dissuade an employee from taking leave.  *See Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007).  However, Plaintiff has explicitly brought a retaliation claim, not an interference claim, and must show that she suffered an action that a reasonable employee would find materially adverse.  *Id.*  Furthermore, Plaintiff has failed to cite any evidence in the record supporting this allegation.  The Court has no obligation to scour the record in search of evidence to support Plaintiff's claims.  *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000) (holding that the Court is "not obligated to comb the record in order to make [Plaintiff's] arguments for [her].").  "[O]n a motion for summary judgment, 'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record."  *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004).  The Court therefore finds that this allegation fails to satisfy the second prong of Plaintiff's *prima facie* case.

As to the other alleged adverse actions, Plaintiff cites no authority supporting a finding that the workplace criticism Plaintiff faced, however unfounded, constitutes a materially adverse action under the caselaw in this Circuit.[8]  Plaintiff also fails to cite any evidence demonstrating that the workplace criticism she faced was particularly adverse to her because of any specific circumstance, as discussed in *White*.  Instead, Plaintiff states conclusorily that the general context of Plaintiff's position at Metro State made these actions materially adverse such that they would dissuade a reasonable

---

[8] The only case Plaintiff cites, *Williams v. W.D. Sports, Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007), dealt with an employer's opposition to the employee's claim for unemployment benefits after termination, and Plaintiff fails to analogize it to any of the alleged adverse actions here.  (ECF No. 54 at 27–28.)

employee from requesting FMLA leave. (ECF No. 54 at 28.)

The Court finds that Plaintiff has failed to show that any of the alleged adverse actions were materially adverse under *White*. Therefore, Plaintiff has failed to meet her *prima facie* burden.

Even if the Court were to find Plaintiff's *prima facie* burden satisfied, as with Plaintiff's Title VII retaliation claim, she has completely failed to present any evidence that Defendant's non-retaliatory reason for its actions was pretextual. Plaintiff instead argues that Metro State improperly required Plaintiff to resubmit her medical certification without any valid reason, ignoring and violating FMLA requirements and suggesting that Defendant's proffered reason is implausible. (ECF No. 54 at 31.) However, Moore's response to Plaintiff's inquiry about resubmission of her application explains that Plaintiff's initial approval was an expedited approval, and that subsequent documentation was still required. (ECF No. 51-14.) Plaintiff's subsequent confusion about that e-mail (*see* Pl.'s Dep. p. 163) does not make Moore's explanation implausible, nor does it cast doubt on the history of performance issues elsewhere in the record. The Court concludes that Plaintiff has failed to satisfy either of her burdens in the *McDonnell Douglas* analysis, and therefore summary judgment is appropriate in Defendant's favor on her FMLA retaliation claim.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby ORDERS as follows:

1.  Defendant Board of Trustees of Metropolitan State University of Denver's Motion for Summary Judgment (ECF No. 50) is GRANTED; and

2.      The Clerk shall enter final judgment in favor of Defendant in accordance with this

Order and shall TERMINATE this case.  The parties shall bear their own costs.

Dated this 10th day of July, 2015.

BY THE COURT:

William J. Martinez
United States District Judge